UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**ROBERT L. HENARIE**,                                    Civil Case No. 3:11-CV-00994-KI

                Plaintiff,                       OPINION AND ORDER

    v.

**THE PRUDENTIAL INSURANCE
COMPANY OF AMERICA**,

                Defendant.

      Megan E. Glor
      John C. Shaw
      621 SW Morrison, Suite 900
      Portland, OR 97205

          Attorneys for Plaintiff

Page 1 - OPINION AND ORDER

John MacMillan
MacMillan, Scholz & Marks, P.C.
900 SW Fifth Ave., Suite 1800
Portland, OR 97204

      Attorney for Defendant

KING, Judge:

Pursuant to the Employee Retirement Security Act of 1974 ("ERISA"), 29 U.S.C.

§ 1132(a)(1)(B), plaintiff Robert Henarie challenges defendant Prudential Insurance Company of

America's decision to terminate his long-term disability benefits.  Pending before me are the

parties' cross-motions for summary judgment [28, 31].  For the following reasons, I grant

Henarie's motion for summary judgment and deny Prudential's motion.

## BACKGROUND

Henarie was working as a partner with the accounting firm KPMG until mid-September

2005–he had been there for almost 30 years.  Five months later, on February 28, 2006, Henarie

submitted a claim for disability benefits to Prudential supported by a statement from his primary

care physician, Dr. Eugene Uphoff, diagnosing Henarie with sick sinus syndrome, syncope,

migraine headaches, and an inability "to reliably perform calculations and cognitively process

complex information."  AR 339.  Prudential approved Henarie's long-term disability claim under

a provision of the Plan allowing for 24 months of payments for a mental illness (depression, in

this case).  Henarie disputes that his disability is solely due to depression and asserts entitlement

to an additional $410,000, plus pre-judgment interest, which represents slightly fewer than

14 months of additional monthly payments of $30,000 each until his 60th birthday.

Page 2 - OPINION AND ORDER

## LEGAL STANDARDS

In this ERISA case, given the stipulation of the parties, the court is tasked with assessing the validity of Henarie's claim under a de novo standard of review.  Firestone Tire & Rubber v. Bruch, 489 U.S. 101, 115 (1989); Def.'s Mem. in Supp. of Mot. for Summ. J. 15 (reflecting stipulation of the parties).  Under this standard, the plan administrator is not entitled to deference; the court "simply proceeds to evaluate whether the plan administrator correctly or incorrectly denied benefits[.]"  Abatie v. Alta Health & Life Ins., 458 F.3d 955, 963 (9th Cir. 2006) (en banc).  It is the claimant's burden of proof to establish that he was disabled under the terms of the plan.  Muniz v. Amec Constr. Mgmt., Inc., 623 F.3d 1290, 1295-96 (9th Cir. 2010).  The court's review is generally limited to the administrative record and only in very limited circumstances may the court consider extrinsic evidence.  Opeta v. Nw. Airlines Pension Plan for Contract Emps., 484 F.3d 1211, 1217 (9th Cir. 2007).

## FACTS

I.    Policy Language

The main issue in this case is whether Henarie's disability is now excluded from Prudential's Plan.  Prudential does not dispute Henarie suffers from physical impairments and from depression and anxiety.  Rather, the insurance company argues Henarie is limited to only 24 months of payments because his disability is "due in whole or in part" to a mental illness.

The language at issue is as follows:

**What Disabilities Have a Limited Pay Period Under Your Plan?**

Disabilities due to a sickness or injury which, as determined by Prudential, are primarily based on **self-reported symptoms** have a limited pay period during your lifetime.

Disabilities which, as determined by Prudential, are due in whole or in part to **mental illness** also have a limited pay period during your lifetime.

The limited pay period for self-reported symptoms and mental illness combined is 24 months during your lifetime.

KPMG Group Contract at 00028 (emphasis in original) [ECF No. 27-1].

However, "Prudential will not apply the mental illness limitation to **dementia** if it is a result of . . . **trauma** . . . or other conditions not listed which are not usually treated by a mental health provider or other qualified provider using psychotherapy, psychotropic drugs, or other similar methods of treatment as standardly accepted in the practice of medicine." Id. at 00029 (emphasis added).

Finally, Prudential will consider Henarie disabled if he is "unable to perform the **material and substantial duties** of your **regular occupation** as a **partner of KPMG or any other 'Big Four' accounting firms** due to your **sickness** or **injury**; and you are under the **regular care** of a **doctor**." Id. at 00026 (emphasis in original).

II.    Henarie's Medical History

Henarie stopped working at KPMG, after almost 30 years, in mid-September 2005.[1]  He filed his claim with Prudential five months later and only after he was certain he could not return to work.  Prudential contends the record reflects Henarie suffers from depression.  Henarie argues the medical evidence shows he is disabled from physical illnesses, including a traumatic brain injury and post concussive syndrome ("PCS").

---

[1]Prudential, in its briefing, contends Henarie "went out of work" on September 16, and Henarie says he "left work" on September 15.  Compare Prudential's Mem. in Supp. of Summ. J. 1 with Henarie's Mem. in Supp. of Summ. J. 4.

Page 4 - OPINION AND ORDER

A.    Henarie's Physicians

Henarie began experiencing syncopal spells (fainting) in July or August 2005.  On August 18, as a result of one of these spells while driving, he pulled over to the curb and awoke in his neighbor's yard.  AR 231.  At the emergency room, he described headaches for the past several weeks and a syncopal spell one week before where he fell and hit his neck.  He reported "no difficulty with any specific neurologic complaints."  Id.  He exhibited no tenderness over the head or scalp and a head CT scan was negative other than some chronic sinus disease.  The ER physician recommended a heart monitor, rest, and reevaluation.

Henarie followed up with his primary care physician, Dr. Eugene Uphoff.  Henarie described the driving episode in the same way–he blacked out while driving and ended up in his neighbor's yard.  He noted one other syncopal episode in the shower and reported increasing headaches as a result.  His only other complaint was chest pain.  Dr. Uphoff referred Henarie to a cardiologist.

Dr. Aly Rahimtooia, at the Oregon Clinic–Cardiology Division, examined Henarie. Henarie told the doctor about passing out three times in the last four weeks.  The first time was just after finishing a shower; Henarie fell down and hit his head.  See also AR 268 (consistently reporting fell in shower the first time and woke up with a bruise on his head).  The second time occurred while he was in the shower, and he awoke on the floor.  The final time was while he was driving, when he ran into a curb (described above).  Dr. Rahimtooia noted, "He has been having difficulties with memory as well as headaches, though there is some thought that this may represent postconcussion syndrome."  AR 239.  The doctor recommended an echocardiogram, noticed the normal head CT, but thought "other etiologies, particularly neurologic ones, cannot

be excluded." AR 240. He recommended neurologic input if his cardiovascular evaluation was

negative.

Henarie and his wife made an appointment with Dr. Thomas Kasten because they were

"frustrated with not knowing why he has had the syncope and wanting to speed up his workup for

possible causes." AR 245. Dr. Kasten noted five syncopal episodes in the past five weeks, the

third of which "landed him in the hospital after he lost consciousness while driving his car and

ran into a cement wall in a neighbor's yard." AR 244. Henarie described persistent headache

over the last three weeks, different from his occasional migraine headaches. He "does note some

being less well able to concentrate, being easily distracted, sleeping less well in the past three

weeks. He also has not worked in the past three weeks. He has a very demanding jobs where

errors are not acceptable and he feels unable to return to work at this time." Id. Henarie reported

a history of depression. Dr. Kasten reassured Henarie and his wife that the workup thus far had

been appropriate.

Henarie went to Dr. Richard Rosenbaum on September 13, 2005. He described hitting

the retaining wall, but doubted a head injury. He mentioned having headaches all his life, but

now getting "left occipital burning pain . . . after hitting head with first spell, intermittent, lasts

couple of hours, present most days, treatment acetaminophen; left temporal headache also began

after hitting head, present most days, lasts about an hour, takes apap." AR 248. He also reported

feeling depressed, although having some depression for years due to stress at work, and recent

anxiety. He believed his memory was worse and he observed some tingling in his fingers and

toes. Dr. Rosenbaum diagnosed syncope versus seizure, probable concussion, and migraine plus

new post traumatic headache. Dr. Rosenbaum wrote to Dr. Uphoff, reporting a normal

Page 6 - OPINION AND ORDER

neurologic examination, but needing to exclude seizures with an MRI and a sleep deprived EEG.

He also remarked, "He does have a long history of migraine, and now has mild post concussive

effects including trouble with memory and headaches." AR 252. Dr. Rosenbaum expected the

symptoms to improve over a period of months.

Henarie's sleep-deprived EEG was mildly abnormal and his MRI was essentially negative

in late September 2005.

Henarie told Dr. Shawn Patrick about his "frequent massive headaches, which have

occurred since he fell and struck his head in the shower but [which] also seem to have become

more frequent since he has been having syncopal episodes." AR 260. Dr. Patrick reviewed

Henarie's heart monitor results and found "a significant set of sinus pauses at the time of one of

these episodes consistent with sick sinus syndrome." AR 261. To correct the problem,

Henarie had a pacemaker implanted on October 20, 2005.

Despite the pacemaker, Henarie continued to complain to Dr. Uphoff of fatigue, cold

fingers and toes, nausea, and persistent headaches, confusion and forgetfulness. AR 295.

At Dr. Uphoff's request, psychologist Dr. Larry Friedman evaluated Henarie's memory

impairment on December 7, 2005. Henarie described several syncopal episodes beginning in

July 2005, including falling and striking his head in the bathroom and losing consciousness while

driving. He reported experiencing no obvious head trauma. Henarie complained of almost

constant headache since the first syncopal episode, limited ability to concentrate for more than 15

minutes, and a less reliable memory. He tested in the superior range of verbal intellectual ability,

in the average to high average range of nonverbal intellectual ability. His processing speed index

was average and his testing on abstraction, logical analysis and conceptual flexibility was in the

average range.  Dr. Friedman thought some of the minor abnormalities and inconsistencies in the

test results were due to emotional and psychological factors based on Henarie's self-reported

symptoms of depression.  He opined, "There is little reason to suspect objective

neuropsychological dysfunction on the basis of this test record . . . . Mr. Henarie appears to be

seriously depressed."  AR 308.

Henarie reported to Dr. Uphoff that Dr. Friedman found his memory and intellectual

function to be normal, but that he was severely depressed and Henarie "concur[red] with this

assessment."  AR 310.  Dr. Uphoff prescribed Fiorinal for headaches and Cymbalta for

depression.  A January 2006 report reflected Henarie's depression was "only somewhat

improved."  AR 318.  Henarie expressed amazement that he was able to do as much work for as

long as he did since two people had filled his position at the office.

Dr. Gordon Lindloom began seeing Henarie for depression at the end of January 2006.

Henarie also complained of extreme exhaustion, hypersomnia, severe and debilitating right

hemisphere migraine headaches, memory loss, and inability to concentrate or remember simple

information presented orally or in writing.  He reported losing consciousness on three occasions,

and receiving a concussion after hitting a wall while driving.  AR 509.  Dr. Lindbloom diagnosed

"Major Depression, Single Episode, Severe, with no psychotic features."  AR 358.  Dr.

Lindbloom did make a side note that, "His memory problems and energy problems look like

brain injury.  How much of this might be attributable to depression is probably unknowable

except through a significant period . . . of trial and error learning[]."  AR 509.

In progress note after progress note, and in various letters and reports, Dr. Lindbloom

repeated his hypothesis that Henarie's Type A personality (working 2400 hours a year for 30

years), combined with the stress of his job, his father's death, and his son's drug abuse, resulted in "neurological burnout."  AR 512; see also 510, 513, 359.  After reviewing Dr. Friedman's test results, Dr. Lindbloom opined, "With the absence of neurological or psychological test findings of insult or debilitation, it is realistic to hope that Mr. Henarie's problems with memory and concentration will gradually fade away.  He has begun to read again.  Numerous small incidents he has reported to me and his general quick thinking and responsiveness to me in our treatment sessions are early signs of recovery in this domain."  AR 362.  Instead, according to Dr. Lindbloom, memory lapses, concentration problems, and depression are "typical of system in collapse."  AR 512.

Henarie returned to Dr. Rosenbaum on February 3, 2006, complaining of recurrent headaches that increased with stress.  Dr. Rosenbaum noted normal exam and normal MRI of the brain a few months previously obviated the need for brain imaging.  He directed Henarie to stop taking Vicodin and Flomal in case chronic analgesic use was the culprit, and instructed him to avoid eating preserved meats.  "His headache may be a symptom of his depression, for which he is already pursuing treatment."  AR 328.

Dr. Uphoff commented on February 17 that Henarie was considering disability because of his loss of focus and attention, memory problems and headaches.  Although he "performed well" on the neuropsych evaluation, he was "found to be profoundly depressed."  AR 330.  Henarie was taking antidepressants but "doesn't feel it has made a lot of difference" and described his brain as being "in neutral."  Id.  Dr. Uphoff opined, "He really is disabled and cannot return to work because of his inability to maintain focus and attention."  Id.

Page 9 - OPINION AND ORDER

Henarie saw his primary care physician, Dr. Uphoff, on March 21, 2006.  At that time he reported improved headaches on Toprol, but cold hands and feet, depression being treated with Cymbalta, problems with his right knee, and TMJ pain.  AR 343.

In 2006 and 2007, in visits with Dr. Uphoff, Henarie complained of dizziness, continued intractable depression despite medication and counseling, tremors, memory problems, episodic chest pain, and a broken ankle after a vertigo-induced fall.  Dr. Lindbloom also continued to counsel Henarie about his anxiety and depression.  A visit to Dr. Rosenbaum in January 2007 yielded medication changes for headache treatment.

Dr. Uphoff referred Henarie to Dr. Michael B. Fleming to evaluate Henarie's vertigo. Henarie complained of dizziness, vertigo, confusion, and occasional problems with speech, but he thought the latter two symptoms were due to medication.  Dr. Fleming diagnosed vestibular neuronitis[2] and recommended vestibular rehabilitation.

Toward the end of 2007, Henarie saw Dr. Christina Peterson, a neurologist at the Oregon Headache Clinic.  Henarie complained about word finding problems since the car accident and memory difficulty, although not for "off the wall things."  AR 635.  Based on questionnaires he completed about the frequency and impacts of his headaches, Dr. Peterson noted his Migraine Diability Assessment Score was a grade 4 out of 4, representing severe disability.  Similarly his Headache Impact Test was 68, a very severe impact.  She recommended various prescription changes.

---

[2]"[A] disorder of uncertain etiology that is characterized by transitory attacks of severe vertigo."  www.merriam-webster.com/medlineplus/vestibular neuronitis (last visited 5/23/13).

In late 2007 and early 2008, Dr. Edward Lairson at the Orthopedic & Fracture Clinic treated Henarie for severe left foraminal stenosis at L5-S1 with epidural steroid injections. Henarie reported short-term memory loss in providing his medical history.

At Dr. Rosenbaum's suggestion, Dr. Hubert Leonard saw Henarie in early 2008 for headaches. Henarie described a long history of headaches beginning in his childhood, and by his early twenties he had headaches every day requiring six to eight aspirin a day. Henarie described having near daily mild to moderate headaches the past ten years. He then reported several head injuries from syncope-induced falls and stressful family situations in 2004 and 2005, causing markedly worse headaches and migraines occurring days in a row. By then he was taking ten tabs of aspirin a day. Dr. Leonard commented on Henarie's "longstanding medication overuse." AR 693. Topamax helped to decrease the number of headaches, but Henarie mentioned still having them five days a week. Dr. Leonard doubted he could "render him headache free" but would try to lessen the pain.

Dr. Leonard commented, "Whether the mild concussions aggravated his underlying headache disorder is not clear." AR 693. Dr. Leonard cautiously increased the dosage of Topamax, but suggested remaining aware of any cognitive/memory and language problems or worsening anxiety as those side effects were occasionally seen with the drug. Dr. Leonard saw Henarie a total of nine times throughout 2008 and 2009, and diagnosed Henarie with chronic daily migraine, history of medication overuse, anxiety and depression, as well as chronic low back pain with hip radiation and mild Parkinsonian tremors triggered or worsened by medication. In 2009, Dr. Leonard wrote a statement in support of Henarie's first appeal opining that

Henarie's low back pain limited his activity level, and his combined medication caused symptoms of lack of focus, memory gaps, tremors, impaired balance, anxiety and depression.

Henarie scheduled one last appointment with Dr. Uphoff on January 23, 2008, before the doctor's retirement and transfer of Henarie's care to Dr. Cynthia Shaff-Chin. Dr. Uphoff noted Henarie's ankle fracture, vertigo, continuing migraines, low energy and continuing depression. Dr. Shaff-Chin, in a visit a week later, assessed back pain, depression, migraine headaches and hypertension.

Dr. Peterson, at the Oregon Headache Clinic, observed cognitive confusion and attributed it to the higher dose of Topamax prescribed by Dr. Leonard. She asked Henarie to watch for cognitive slowing or loss of word finding on the increased Topamax dose. Henarie "indicate[d] that he has always spoken slowly. He did have some cognitive decline when he first reached Topamax 100 mg, but feels that this has dissipated and assures me that he will watch for this." AR 720.

By February 2008, Henarie told Dr. Leonard that his headaches were down to two a week and that the Topamax was helping. Dr. Leonard commented Henarie was slow moving and slow speaking, with a minor tremor in his hands and mild facial masking, and recommended eliminating the Seroquel.

Henarie continued twice a month therapy sessions with Dr. Lindbloom. He consistently complained of headaches, vertigo, and memory problems. He also described a visit with friends who called the next day to check on Henarie because they were concerned about his difficulty tracking the conversation, his sagging face and his bent posture the night before.

On March 26, 2009, at the request of his counsel, Henarie participated in a functional capacity evaluation. Physical therapist Patrick Pua found Henarie restricted to light level with material handling, but could handle only 15 to 20 minutes of sitting, standing or walking before pain affected his tolerance. Pua believed Henarie would have difficulty traveling–meaning "airplane rides & transfers while carrying heavy loads, working at different workstations and makeshift computer stations at hotel rooms. In light of his postural restrictions, I feel that this component of his physical capacity restricts him from performing his former work as a CPA/auditor." AR 919.

B.    Reviewing Physicians

In June 2006, during Prudential's initial review of Henarie's claim, Dr. Joyce Bachman, an internal medicine consultant, reviewed Henarie's medical records. She thought Henarie's sick sinus syndrome, blood pressure, migraines, and TMG were well controlled by medication, but thought headaches were an "ongoing problem." AR 81. Although she did not believe Henarie's depression was limiting, she recommended a psychiatrist should review the record.

In July 2006, Prudential had a psychiatric consultant review Henarie's medical records. On July 13, Dr. Stephen Gerson issued an extensive report opining Henarie was not disabled by depression or anxiety. About a week later, Dr. Gerson spoke with Dr. Lindbloom who informed Dr. Gerson that Henarie was not interested in going back to work, and that Henarie had "taxed his neuroendocrine system over the years to the point where he has had a diffuse collapse and a fragmentation of his adrenals and stressed self regulatory system. [Dr. Lindbloom] doesn't feel the claimant will be able to substantially reintegrate to the point where he could go back to work; however, he does feel he is improving somewhat in the recent period." AR 452.

Page 13 - OPINION AND ORDER

On July 23, based in part on his conversation with Dr. Lindbloom, Dr. Gerson changed

his opinion.  He concluded Henarie exhibited a

> mild to moderate level of psychological and cognitive impairment primarily based
> on depression and ongoing poorly treated anxiety. . . . His current lifestyle is
> clearly at a markedly less functional level than what would be necessary for him
> to function as a very high level partner at [KPMG].  I don't think he has the
> cognitive and emotional capacity to return to work as a high level partner at
> [KPMG] at this time.  This state is likely to persist, particularly given the
> limitations in his current treatment . . . .  I think the claimant is functionally
> impaired for the functions of his job as a partner at [KPMG].

AR 453-54.  He noted he "predicate[d] my change in opinion from my 7/13 report on [the] fact

that there is NO evidence of prior disability behavior on the part of the claimant, the credibility of

Dr. Lindbloom, and the reality of a VERY demanding high level job, all in the context of

treatment with limitations and possible iatrogenic cognitive contribution of unclear Medication

regimen."  AR 453.

Dr. Landy Sparr prepared an independent psychiatric evaluation on August 28, 2006 and,

after reviewing medical records including Dr. Gerson's opinion, administering the MMPI-2, and

interviewing Henarie for three hours, diagnosed Henarie with Major Depressive Disorder, severe,

without psychotic features, with obsessive-compulsive traits.  Dr. Sparr described slow speech

with long response latencies, quiet mood, and flat affect.  He observed Henarie's highly impaired

immediate memory and difficulty concentrating on tasks.  Henarie could not recall three words

after five minutes, made mistakes on serial sevens and could not name the Governor.  He

hesitated identifying the President and at first said President Carter.  He thought Henarie's

primary psychological impairment was his inability to concentrate, which Dr. Sparr believed was

"directly related to his major depressive disorder and is part of the symptom cluster."  AR 483.

He found it "doubtful that his impairment is organic and instead appears to be entirely related to his profound psychological depression." Id.

When approaching the 24-month deadline for the expiration of benefits, Prudential hired an internal medicine physician to review the file. On June 27, 2008, Dr. Jill Fallon recommended neuropsychological testing with MMPI "to determine if cognitive dysfunction and personality changes exist and if so, if they were due to organic changes and/or medication and/or depression." AR 66.

Accordingly, Dr. Richard Kolbell conducted a Neuropsychological Independent Medical Examination on three separate days, July 30, August 6, and August 7, 2008, because Henarie "was exceedingly slow throughout forensic interview and testing[.]" AR 791. Dr. Kolbell mentioned Henarie "was very organized in his presentation and in the supplementary materials he provided. Affect was prominently depressed, and remained so throughout examination and testing." AR 792. Henarie told Dr. Kolbell about a history of closed head injury, once when he was five years old, and again in 2005 related to the syncopal episode when he had the car accident. (Dr. Kolbell documented Henarie stopped working three months before the car accident, but in fact other records indicate Henarie worked until mid-September, almost a month after the car accident.)

Dr. Kolbell administered a number of tests to determine Henarie's cognitive abilities:

On the Twenty-One Item Memory Test, he obtained a score of 12/21, which is only slightly above chance and well below levels typically obtained by individuals even with well documented brain injury or dementia. Similarly, on the Test of Memory Malingering, he obtained scores of 28/50, 37/50, and 33/50, which again, compared to normative samples, are well below the range obtained by individuals with severe head injury, dementia, or other well documented cognitive disorders. These scores are most often associated with patients who are not putting forth

Page 15 - OPINION AND ORDER

adequate effort or may be malingering. On the Victoria Symptom Validity Test, he obtained scores of 17/24, 3/24, and 20/48; the overall pattern is of very marginal validity. Specifically, obtaining 3/24 items correct is so significantly beyond the chance level that it can be only reasonably interpreted as intentional effort to perform poorly. Further, his response latencies, averaging approximately 10 seconds per item, are 2-3 times beyond the levels of performance by simulated malingerers. This is also multiple times greater than individuals who are compensation-seeking. On the PAI, Negative Impression Management is nearly 3 standard deviations above the mean, and Malingering Index of T-71 is highly significant. On the MMPI-2, he produced an FBS-34, which, according to the scientific literature, is only seen among individuals who are intentionally exaggerating cognitive and/or psychological deficits. On the Trauma Symptom Inventory, his responses were atypical and severely elevated, and his entire profile is invalid. On the Brief Symptom Inventory, he elevated 6/9 clinical scales at greater than 3 standard deviations above the mean (T-80). These findings are rarely seen outside individuals who are so severely mentally ill they require hospitalization.

Finally, the claimant's time in completing all tests was extraordinarily slow when compared to over 2,000 patients examined in the past ten years in my practice. Performance that is so excessively slow has not been seen in other individuals, even with well documented psychological disorders. Indeed, he required approximately eight hours to complete these measures.

AR 798. Dr. Kolbell diagnosed Major Depressive Disorder, Moderate, per Records; Probable Malingering, per Slick, et al (1999) Criteria.

One week after the interview, Henarie provided a five-page, single-spaced letter, which he wrote with the assistance of his wife, correcting and elaborating on statements he made during the longer than two-hour interview. Dr. Kolbell thought the letter called into question Henarie's memory complaints since "he was able to recall detailed aspects of an extensive forensic interview and relate them to his wife, who prepared and organized documents, and submit[ted] this to me a full week later[.]" AR 802.

Page 16 - OPINION AND ORDER

III.    Insurance Policy Proceedings

Henarie worked full-time for KPMG from September 8, 1975 to mid-September 2005. He applied for Long-Term Benefits under the Prudential Plan on February 28, 2006, alleging sick sinus syndrome, with syncope and migraine headache as secondary afflictions. He asserted memory loss and cerebral dysfunction as additional impairments.

Prudential requested Henarie's medical records and hired an investigator to conduct surveillance. The investigator learned Henarie's son would be graduating on June 17, 2006, and a second round of surveillance was planned. The surveillance revealed Henarie was "usually at home during the day" and occasionally left with his wife. AR 402. Neighbors did not see him working in his yard.

As reflected above, Prudential reviewing physician Dr. Bachman found no physical restrictions, but recommended a referral to Dr. Gerson. While Dr. Gerson initially thought Henarie was not disabled, he changed his mind after speaking with Henarie's therapist, Dr. Lindbloom, and opined Henarie suffered from mild to moderate cognitive impairment from depression and anxiety. Dr. Sparr, also a psychiatrist, confirmed the diagnosis.

Prudential approved Henarie for benefits effective September 15, 2006 based on his psychiatric condition only. As a result, his benefits were terminated on September 15, 2008 under the 24-month mental health limitation under the Plan. Right before termination, Prudential reviewed the new medical records, Dr. Fallon's report, and Dr. Kolbell's report. Prudential concluded Henarie could perform his regular occupation since he was not precluded from sedentary work and his neuropsychological testing was invalid due to poor effort and/or exaggerated responses.

Page 17 - OPINION AND ORDER

After learning that Henarie had hired counsel and intended to appeal, on September 25, 2008 Prudential hired an investigator to place him under surveillance. The investigator watched Henarie's movements from October 14 through 16, and again on October 25 and 26. The investigator saw Henarie leave his home for five minutes one day and, on another day, drive to the hospital and then ride in the car to an office building. On a final day, the investigator followed Henarie, as the passenger in a car, to an office building and then to a shopping center where he appeared to pick up a prescription. The investigator captured five minutes of activity on videotape and reported no sign of physical or mental disabilities.

Represented by counsel, Henarie filed an appeal on July 13, 2009. He listed the documents he enclosed with his appeal on the first page of his letter, including letters from Dr. Lindbloom (dated February 19, 2009), Dr. Shaff-Chin (dated April 1, 2009), and a letter from Dr. Leonard (dated June 12, 2009). AR 905, 908, and 911. Counsel also quoted extensively from these letters in his own appeal letter. Dr. Lindbloom and Dr. Shaff-Chin disputed any malingering. For example, Henarie "had gone from being a productive and successful businessman to someone who now struggles to manage various treatments for his complex medical conditions" opined Dr. Shaff-Chin. AR 909. She noted he "is not a malingerer in any sense of the word and greatly desires to have his health improve." AR 910.

The appeal also included the observations of a retired managing partner who used to work with Henarie, and who has known him since 1975. Henarie walked slowly with tentative steps and exhibited a slower reaction time. "He has to really think about his responses when questions are posed to him, as if he is at a loss for the right words. . . . I look at Bob now and do not see the same person I knew when he was working at KPMG." AR 916.

Page 18 - OPINION AND ORDER

The theme of the appeal was that Henarie had been diagnosed with additional physical medical conditions, including spinal stenosis and foraminal narrowing, seizures/involuntary movement disorder, Parkinson's disease, chronic renal insufficiency, elevated creatine kinase, numbness in his legs and feet, and cognitive dysfunction. Henarie's contention was that these additional medical problems, plus the previously diagnosed syncopal spells, migraine headaches, and PCS, combined to make him disabled independent of any psychiatric condition.

Prudential requested an internist, Dr. Judith Esman, and a neurologist, Dr. Steven McIntire, review the record on appeal. The doctors together believed Henarie's history of syncope, some balance problems, and history of frequent falls warranted limitations such as avoiding work at heights, climbing ladders, and negotiating uneven surfaces. The degenerative changes in his lumbar spine would mean Henarie could lift or carry no more than 20 pounds occasionally and 10 pounds frequently, was limited to bending/reaching below the waist, could sustain no more than 15 minutes per hour of walking and standing, with walking no more than two hours in an eight-hour day. Henarie's ability to sit was unrestricted, but Henarie should change position once every hour for three to five minute intervals. Additionally, the doctors agreed that, "due to his history of syncope[, Henarie] should not drive in a professional capacity." AR 996. Dr. McIntire clarified that he meant Henarie should not be driving others or driving large vehicles as part of his work, such as a bus or truck driver. AR 1004. The doctors found no limitations related to: migraine headaches, sick sinus syndrome, bradycardia causative dysfunction, hypertension, hyperlipidemia, seizures, concerns about Parkinson's disease, lack of arm strength, renal insufficiency, elevated creatine and CPK, and PCS.

Page 19 - OPINION AND ORDER

With respect to headaches, Dr. McIntire specifically commented that Henarie lacked the history of emergency room visits or inpatient treatment for his headaches which those suffering from impairing migraines typically have.  He opined there were additional medications Henarie had not tried, and that the headaches were likely due to "medication overuse or rebound headaches."  AR 1003.

Dr. McIntire also found cognitive dysfunction not supported by the objective testing, but consistent with malingering, and no history or objective findings suggestive of seizures or abnormal movement disorder.

On October 7, 2009, Prudential informed Henarie that it had properly terminated his benefits.  It concluded, after summarizing the reports of the reviewing doctors, that Henarie did not have a physiological impairment that would preclude him from performing his regular occupation as an Audit Partner.  The headaches fell under the self-reported limit in the plan.

On June 4, 2010, Henarie's counsel submitted a second appeal.  He provided many of the same documents as those accompanying the first appeal, but he also provided updated statements from Dr. Lindbloom (dated May 14, 2010), Dr. Leonard (dated May 24, 2010), and an evaluation from a pain management consultant (dated May 22, 2010).  AR 1030-75.  However, Prudential did not receive all of the enclosures–it did not receive the 2010 letters from Dr. Lindbloom and Dr. Leonard.  Henarie's counsel did quote extensively from the 2010 letters in his appeal letter, which Prudential did receive.  The 2010 letters, as quoted by counsel, hypothesized that Henarie's depression, balance problems, fatigue, memory problems, attention problems, headaches, anxiety, slowed speech and slowed thinking were the result of PCS or a traumatic brain injury.  Prudential called Henarie's counsel to see if there were any further medical records

Page 20 - OPINION AND ORDER

to submit, but did not mention the missing enclosures.  Counsel responded that the appeal was complete.

Prudential asked Alan Cusher, Ph.D., to complete a review of Henarie's file after the second appeal, in August 2010.  Dr. Cusher did not reference the most recent appeal letter, the medical records quoted in the letter, or the diagnosis of PCS.  Dr. Cusher summarized Dr. Kolbell's report and noted raw data was not provided.  "Taken at face value," Dr. Cusher opined, "[Dr. Kolbell's] findings would not support the presence of functional impairment due to the fact that the neuropsychological testing was considered invalid and there would not be sufficient confidence that the data would provide an accurate assessment of functioning in general.  This does not preclude the presence [of] impairment but renders this particular evaluation of little use in objectively measuring functioning (whether impaired or unimpaired)."  AR 15-16.  Dr. Cusher also pointed out Dr. Kolbell did not compare the test results obtained by Dr. Friedman and Dr. Sparr.  Dr. Cusher concluded, "At this point, almost two years after Dr. Kolbell's evaluation and over four and one half years after Dr. Friedman's more detailed analysis would require review of the respective raw data."  AR 16.

From a physical perspective, also in August 2010, Dr. Richard Day reviewed the claim and concluded Henarie could work at a sedentary level.

On August 19, 2010, Prudential upheld the decision to terminate Henarie's benefits.

Page 21 - OPINION AND ORDER

**DISCUSSION**

I.    Post-Concussion Syndrome

Henarie argues his primary disability is due to PCS, which qualifies as "dementia caused by trauma" under the Plan and not subject to the 24-month mental illness limitation.[3]  As I stated at oral argument, this is a case that could have gone either way.  I am persuaded, however, to rule in favor of Henarie for the following reasons:  Henarie's physicians provided in-depth, coherent explanations that, looking back through Henarie's medical history and trying to put the puzzle back together, provide the only rational explanation for Henarie's rapid deterioration and symptoms after a 30-year work history.  Prudential's consultants, in contrast, could not persuasively explain why his symptoms would not preclude Henarie's work as a high-powered partner at KPMG and did not adequately evaluate the legitimacy of PCS as a diagnosis.  In addition, I conclude Prudential's sloppy approach to Henarie's claim, and specifically its treatment of his second appeal, puts a thumb on the scale for Henarie.

I start first with Henarie's character and the reason he stopped working.  For almost 30 years Henarie worked for KPMG.  He worked twice as much as was required, billing 2500 hours a year when only 1250 were required.  He began treatment for depression in 2004, but *continued to work* at the same high level.  He planned, in fact, to continue working five more years before retiring.  Notably, Dr. Gerson, on whose opinion Prudential relied in eventually approving Henarie's claim, underscored that "there is NO evidence of prior disability behavior on the part of the claimant[.]"  AR 453.  Instead of retiring as planned, however, Henarie developed

_____

[3]Henarie raised additional arguments, but I need not address them as this one is dispositive.

Page 22 - OPINION AND ORDER

syncope, precipitating bouts of unconsciousness that resulted in him hitting his head on at least

one occasion.  During another one of these episodes, he found himself in a neighbor's yard

having driven up over the curb and into a retaining wall.  Both Prudential and Dr. Gerson seemed

to recognize that Henarie would not have stopped working but for the syncopal episodes.  AR

177.

    Dr. Uphoff, Henarie's primary care physician, submitted the disability application

identifying sick sinus syndrome, syncope and migraine headaches as his major afflictions, but

Prudential consultant Dr. Gerson was persuaded by Henarie's psychologist, Dr. Lindbloom, to

conclude Henarie was incapable of performing his "VERY demanding high level job" at KPMG

due to his depression.  AR 453.  Dr. Gerson found Dr. Lindbloom to be a "credible informant."

Id.

    Although Dr. Lindbloom and most of Henarie's other providers initially landed on

depression to explain Henarie's memory and cognitive problems, Dr. Lindbloom and Dr.

Leonard later explained in their 2010 reports, as quoted by Henarie's counsel in his second

appeal letter, that Henarie's symptoms were more obviously connected to a closed head injury.

Prudential did not receive the letters from these physicians as part of the second appeal, but

counsel quoted from them extensively in his letter.  Specifically, counsel quoted from Dr.

Lindbloom's report, in which Dr. Lindbloom listed the PCS-related symptoms the doctor had

observed in Henarie, including impaired coordination, impaired balance, sleep problems, fatigue,

seizures, memory problems, attention and concentration problems, headaches, dizziness,

depression not responsive to psychological intervention, anxiety, photophobia, phonophobia,

Page 23 - OPINION AND ORDER

impaired social interactions, slowed speech and slowed thinking.  Counsel also reported Dr.

Lindbloom's anecdotal corroboration of Henarie's concentration problems.

Henarie's counsel additionally quoted Dr. Leonard's observations of Henarie's cognitive

dysfunction, memory problems, lack of attention, slow speech, and concentration problems.  He

explained he initially thought Henarie's symptoms were related to medications, but after multiple

medication changes he thought PCS was to blame.

> Post-concussive syndromes are generally not related to the severity of the initial
> injury and these symptoms may persist for years.  Post-concussive syndrome can
> include cognitive dysfunction, memory impairment, inability to concentrate,
> decreased attention as well as altered mood.

AR 1078.  Counsel explained to Prudential that Dr. Leonard believed Henarie was "unlikely to

make any additional improvement."  Id.[4]

I suppose Dr. Lindbloom and Dr. Leonard's reports could certainly be characterized as

"advocacy letters."  Nevertheless, the letters are detailed, well-supported, and provide the only

explanation for the constellation of symptoms suffered by Henarie.  I concede that the timing of

the letters is somewhat troubling, coming so late in the proceeding, but I simply cannot accept

Prudential's assertion that two separate doctors would jeopardize their licenses to lie so Henarie

_____

[4]Prudential argues I should remand, rather than considering the "extra-record" material.
First, I have not considered the underlying source material, only Henarie's counsel's accurate
summary of the doctors' reports in the letter Prudential received.  Further, remand is not
appropriate as Prudential has made it clear it would have made the same decision.  Finally, the
court may hear "evidence outside the administrative record when the standard of review of the
administrative decision is de novo."  Gunn v. Reliance Standard Life Ins. Co., 399 Fed. App'x.
147, 150 n.8 (9th Cir. 2010) (citing Banuelos v. Constr. Laborers' Trust Funds for Southern Cal.,
382 F.3d 897, 904 (9th Cir. 2004).  See also Opeta v. NW Airlines Pension Plan, 484 F.3d 1211,
1217 (9th Cir. 2007) (court may exercise its discretion to consider evidence "only when
circumstances clearly establish that additional evidence is necessary to conduct an adequate de
novo review of the benefit decision").

could collect additional insurance proceeds.  I think it is much more likely Henarie's physicians

seized on depression early, a diagnosis Henarie accepted, and only with time have they had an

opportunity to accurately assess Henarie's diagnosis.  Furthermore, while it is true Henarie

suffered from depression before his syncope, it was not debilitating.  Indeed, it was only after the

syncope-induced falls that Henarie suffered the other symptoms related to PCS, which

precipitated his leaving work.  Prudential's reviewing doctors neglected to grapple with the fact

that Henarie continued to work through his depression, and it was only after he experienced the

syncopal episodes that he began complaining of headaches of a different kind, cognitive slowness

and memory impairments.

Prudential argues there is no evidence of a concussion, pointing to Henarie's normal MRI

result following Dr. Rosenbaum's examination of him in September 2005.  Prudential neglects to

cite to any medical source supporting the proposition that a normal MRI precludes a diagnosis of

PCS.  In contrast, Henarie provided sources indicating minor head injuries, which may induce the

symptoms reported by Henarie, may not produce brain abnormalities on an MRI or CT scan.  AR

1097, 1117.  Before the normal MRI, both Dr. Rahimtooia and Dr. Rosenbaum noted the

possibility of PCS.  AR. 239 (memory problems "may represent postconcussion syndrome"); AR

252 (Henarie presented with "mild post concussive effects including trouble with memory and

headaches").  Dr. Rahimtooia agreed a normal head CT is "reassuring," but thought other

neurologic etiologies for Henarie's headaches and memory loss should not be excluded.  AR 240.

Even after the normal MRI, Dr. Lindbloom said, "His memory problems and energy problems

look like brain injury.  How much of this might be attributable to depression is probably

unknowable except through a significant period . . . of trial and error learning[]."  AR 509.

Page 25 - OPINION AND ORDER

There is no question the medical record shows a litany of missed signs. Dr. Friedman found "little reason to suspect objective neuropsychological dysfunction" and pinned Henarie's cognitive dysfunction on depression. AR 308. Dr Friedman's diagnosis failed to account for Henarie's increased, and different, headaches. Without explanation, Dr. Sparr similarly believed Henarie's impairment was not organic, but thought it was related to his "profound psychological depression." AR 483. Dr. Uphoff, Henarie's primary care physician until the doctor retired, noticed depression, headaches and problems with focus and attention and referred him to a psychiatrist. AR 310, 352. Dr. Lindbloom began treating Henarie for depression and anxiety, which he believed was caused by a breakdown after several stressful years. These doctors missed the bigger picture which is that, even after the pacemaker was implanted, Henarie's fatigue, memory loss, and cognitive dysfunction continued. He also had dizziness, periodic chest pain, and headaches of a different nature than before.

I do not ignore Henarie's latest neuropsychological examination producing invalid results and suggesting Henarie was malingering. Dr. Kolbell's conclusions are well-documented. I do note, however, that Dr. Kolbell incorrectly dated the car accident as occurring three months after Henarie stopped working, when the syncopal episodes and car accident actually precipitated his absence from work. I question whether this incorrect chronology may have colored Dr. Kolbell's observations. Furthermore, Henarie's detailed letter, which he prepared with the help of his wife, undermines Dr. Kolbell's conclusion of malingering. If Henarie was trying to achieve specific test results, he would not seek to contradict his poor performance by submitting an articulate and thorough letter. Finally, Prudential consultant Dr. Cusher's analysis of Henarie's cognitive impairments was inconclusive. He suggested Dr. Friedman's analysis was more detailed,

questioned why Dr. Kolbell did not consider Dr. Friedman's and Dr. Sparr's test results to

explain why Henarie's effort would have decreased over time, and agreed Dr. Kolbell's report

did "not preclude the presence [of] impairment but renders this particular evaluation of little use

in objectively measuring functioning (whether impaired or unimpaired)." AR 16.

In the end, given the requirements of being a partner at KPMG, I simply do not accept

Prudential's assertion that Henarie is capable of performing his old job. Henarie's job as a

partner accountant at KPMG required a great deal of top-level thinking and performance. This is

not a policy triggered only when Henarie is unable to work any job; it is a policy providing

benefits to Henarie once he shows he cannot perform the material duties of his own job. The

KPMG job required Henarie to "maintain the highest level of knowledge about [his] partners,

their clients, their clients' industries and the general accepted accounting principles applicable in

those industries." AR 320. He needed to be an "[e]ffective communicator with the ability to

facilitate resolution of complex technical issues within SEC rules & regulations and Firm

professional practice policies, procedures and standards." Id. Finally, his job required him to

"[k]eep pace with new and expanding accounting/SEC rules and interpretations" and devote

"[a]dequate time commitment to perform the responsibilities of an SEC Reviewing Partner."

AR 322.

Additionally, although quoted extensively in counsel's second appeal letter, and not

included among the enclosures, Prudential never informed counsel that the letters were missing.

Furthermore, despite the extensive analysis in counsel's letter, Prudential never considered these

opinions and they are unrebutted. I am bothered by Prudential's failure to specifically request the

obviously missing documentation in support of Henarie's second appeal. I seriously question

whether Prudential's consultants, Dr. Day and Dr. Cusher, reviewed the appeal or any appeal exhibits.  I agree with Prudential that the doctors need not list the material they reviewed, but their opinions ought to reflect that they read and digested Henarie's arguments.  Neither of them seriously considered the PCS diagnosis which is highlighted in Henarie's counsel's letter.

I am not dissuaded by the fact that Henarie never objected to Prudential's decision to award benefits based on a diagnosis of depression.  Prudential's view is that Henarie accepted over $700,000 in benefits without objecting to the finding and it was only after the termination that Henarie began to argue disability based on other grounds.

Henarie replies that he could not have objected because Prudential's decision to award him benefits was not an "adverse benefit determination," meaning "a denial, reduction or termination of . . . .a benefit[.]"  29 C.F.R. § 2560.503-1(m)(4).  Even if it were an adverse decision, Prudential did not inform Henarie of his appeal rights in violation of regulations. 29 C.F.R. § 2560.503-1.

In sum, Henarie has established that he is disabled under the terms of the Plan and that Prudential incorrectly relied on the mental illness limitation in the Plan to terminate his benefits.

II.    Remedy

Henarie demands the $30,000 per month he was due, which was terminated on September 15, 2008, until his 60th birthday on November 4, 2009, which totals $410,000.

The parties dispute whether Henarie is entitled to prejudgment interest, and in what amount.  They both requested the opportunity to confer and, if necessary, hold additional proceedings.

The Court also notes Henarie's demand for costs and attorney fees. The parties are also directed to confer on these amounts.

**CONCLUSION**

For the foregoing reasons, I grant Henarie's Motion for Summary Judgment [31] and deny Prudential's Motion for Summary Judgment [28]. Henarie is entitled to judgment in the amount of $410,000. The parties are to confer on an award of prejudgment interest, costs and fees. If they agree, Henarie shall submit a proposed judgment by June 24, 2013. If the parties cannot agree, the Court will hold a telephone conference to determine how to proceed.

IT IS SO ORDERED.

DATED this ___29th___ day of May, 2013.


 /s/ Garr M. King_____
Garr M. King
United States District Judge

Page 29 - OPINION AND ORDER